# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**Julie Maynard, Inc., doing business as**
**Consolidated Vehicle Converters,**

*Plaintiff/Counter-defendant,*

**v.**

Case No. 3:19-cv-238
**Judge Thomas M. Rose**

**Whatever It Takes Transmissions and Parts,**
**Inc.,** *et al.***,**

*Defendants/Counter-claimants.*

---

**DECISION AND ENTRY GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DOC. 50, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. DOC. 53, 73. PLAINTIFF IS AWARDED SUMMARY JUDGMENT ON ITS CLAIM FOR FAILING TO PAY MONEY OWED; DEFENDANTS ARE AWARDED SUMMARY JUDGMENT ON THEIR RECOUPMENT COUNTERCLAIM. OFFSETTING THE TWO, AS A RESULT DEFENDANTS ARE AWARDED $345,508. PLAINTIFF IS AWARDED SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS FOR CONVERSION AND PUNITIVE DAMAGES. MOTIONS FOR SUMMARY JUDGMENT ARE DENIED IN ALL OTHER RESPECTS AND THE CASE IS TERMINATED.**

---

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment, Doc. 50, and Defendants' Motion for Summary Judgment. Doc. 53, 73. The case involves two parties who went their separate ways, and then decided to litigate over long-ago vague promises made.

1

## I.    FACTS

Plaintiff Julie Maynard, Inc., which does business as Consolidated Vehicle Converters ("CVC"), and Defendant Whatever it Takes Transmissions & Parts ("WIT"), did business together for almost 40 years. Deposition of Marcia Prugh 11: 18-24. WIT sells and distributes automotive transmissions and transmission parts. CVC is a re-manufacturer of used torque converters. CVC was WIT's primary supplier for nearly 20 years. WIT was CVC's largest customer. WIT would send CVC used converter cores with the expectation that CVC would recondition and store them in a core bank to ensure that WIT had cores available.

A torque converter is a mechanical device that goes between a car engine and the transmission, which allows the vehicle to come to a stop without stalling the engine and yet when you push on the gas it transfers power to the tires. Deposition of Tim Prugh 16:9-13. A used torque converter is also called a converter core. Id. 17:3-6. CVC takes used torque converters and remanufactures them into like-new transmission components. Different vehicles use different torque converters.

CVC is owned equally by sisters Julie Maynard Turner and Marcia Prugh, who are daughters of John Maynard. PUF ¶¶ 15-16. Maynard, Turner and Prugh are personal friends of WIT's former President Kenny Hester. PUF ¶¶ 7, 19.

The parties executed a Memorandum of Understanding ("MOU"), dated October 12, 2012, which governed the terms and conditions by which WIT and CVC conducted business. The MOU was signed by Julie Maynard Turner, the President of CVC, and Kenneth Hester, the founder of WIT. Deposition of Julie Maynard Turner 7:1-25; 8:1-17.

> WIT and CVC hereby mutually agree to a 10-year "products requirements contract" (through December 31, 2022) whereby CVC

2

remanufactures converters to be acquired by WIT, under the following enumerated standards and conditions:

l. Minimum number of units manufactured by CVC and sold to WIT approximately equivalent to 2012 levels,

2. Measure of CVC service and quality approximately equivalent to standards achieved in 2012,

3. Industry competitive prices to be mutually agreed upon on an annual basis, to be paid by WIT within commercially reasonable standards.

It is the express intention of both WIT & CVC that that the terms of this Memorandum of Understanding be enforceable in any event during the ten-year term of this agreement - including, but not limited to - (1) changes in ownership or management of WIT or CVC, and/or (2) the sale of stock or assets of either company to a third party.

Doc. 50-1, PageID 484-85.

After his ouster as President of WIT, Hester affied to the existence of a separate

agreement:

I also have personal knowledge of an oral agreement between WIT and Julie Maynard Turner, President of CVC Julie Maynard, Inc. dba Consolidated Vehicle Converters ("CVC"), made at about the same time as the MOU in 2012 where both parties agreed that any used converter cores provided by WIT to CVC would be the property of CVC after one year if not ordered for remanufacture by WIT.

Doc. 52, PageID 489.

Hester was removed as President of WIT on August 8, 2018, because of employee

complaints about his harassing behavior. ECF 53-13 ¶ 3 PageID 735; ECF 53-14 ¶ 9 PageID 739;

ECF 53-15 ¶ 12 PageID 831. This upset John Maynard and he threatened the WIT Board of

Directors, telling them, "Wait until Monday. You'll see what you've done." ECF 53-2 at 28:2-19

3

PageID 540; ECF 53-4 at 41:4-14 PageID 562; ECF 53-5 at 45:21-46:16 PageID 576-77; ECF 53-6 at 58:11-61:6 PageID 589-92; ECF 53-49 PageID 1170. WIT management believed this was a threat to cut off WIT's supply of torque converters. ECF 53-4 at 41:4-42:3, 44:20-45:7 PageID 562, 2550-51. Hester told WIT Salesman Charlie Litchfield that "John [Maynard] wanted to cut you all off immediately as soon as I was let go off the board, and I told them to wait until there was a time advantageous to you." ECF 53-8 at 62:25-65:1.

CVC began negotiating with WIT's competitor Transtar Industries, LLC to enter into an exclusive supplier agreement which would necessitate terminating its relationship with WIT. ECF 53-8 at 70:12-16 PageID 634. For its part, WIT contacted other potential suppliers about the possibility of dual sourcing WIT's torque converter supply. ECF 53-4 at 37:2-6 PageID 561; ECF 53-14 ¶ 14 PageID 740. That way, if there was a problem with one supplier, WIT could purchase products from the other supplier without any severe disruption to its business. ECF 53-10 at 38:8-14 PageID 709. WIT ultimately retained Dynamic Precision Reman, LLC ("Dynamic") as its secondary supplier. ECF 53-4 at 48:5-8 PageID 563; ECF 53-10 at 18:2-5 PageID 699.

In December 2018, WIT informed CVC that it was continuing their relationship but also that it would dual-source its torque converters. PUF ¶¶ 72, 74. CVC never mentioned the MOU or claimed that WIT's proposal would violate that alleged contract. PUF ¶¶ 73, 75-76. Subsequently, CVC complained to WIT several times in January and February 2019 about WIT's volume of purchases; however, it never mentioned the MOU or claimed that WIT was violating or in danger of violating that alleged contract. ECF 53-8 at 10:19-13:8 PageID 598-601; ECF 53-21 at CVC-0089.

4

In 2018 and early 2019, CVC manufactured and sold to WIT torque converters for which it billed $530,598, excluding interest, for which WIT has not paid. Deposition of Tim Prugh 139: 6-20; Deposition of Kelly Hammock 72:3-25; 73:5-23 (Sept. 19, 2020).

On February 15, 2019, CVC terminated its relationship with WIT effective immediately. ECF 53-8 at 53:8-14 PageID 621; ECF 53-24 at WIT 00967 PageID 894. The termination notice did not mention the MOU or alleged violation of it. ECF 53-24 at WIT 00967 PageID 894. That same day, CVC signed an exclusive supplier agreement with Transtar. ECF 53-11 at 31:22-32:9 PageID 716-17; Def.'s Dep. Ex. 14 PageID 1225-26. Since termination, CVC has retained more than 40,000 WIT converter cores and continued to cut them open and use them to fill other orders, PUF ¶¶ 108-12, 118, despite repeated assurances that it would return those cores to WIT. PUF ¶¶ 92-93, 96-107, 113, 116-17.

An aspect of the business relationship which was not addressed in the MOU was transporting, inspecting and storing used converters. WIT sells automotive parts including transmission components. When a customer purchased a replacement torque converter it would often leave the old torque converter with WIT. When CVC delivered remanufactured torque converters to WIT, CVC would pick up used torque converters and take them to Dayton. CVC did not charge WIT for transporting, inspecting and storing used converters. Deposition of WIT by Kelly Hammock 64:16-22 (Feb. 12, 2021). CVC loosely tracked these used cores via a "core bank," an inventory record of the used parts. Deposition of Tim Prugh, 18:9:25;19:1-13.

In practice, if WIT ordered a remanufactured torque converter for which CVC had a used core listed in the core bank, CVC would not charge WIT anything for that part. Deposition of Tim Prugh, 18:9-25; 19:1-13; 115:1- 25;119:3-21. If there was no corresponding part in the core bank,

CVC would purchase the part in the market and pass that charge through to WIT. Deposition of Tim Prugh, 18:9:25;19:1- 13;118:15-24;119:3-21.

Also in practice, and consistent with the understanding reflected in the purported oral contract,[1] any cores in CVC's possession that had not been ordered for remanufacture within one year belonged to CVC. Affidavit of Kenneth Hester (March 12, 2021), Doc. 52, PageID 489. WIT has never paid CVC for storing converters. Deposition of WIT by Kelly Hammock 64:16-22 (Feb. 12, 2021). WIT has never paid CVC for the cost of transporting used cores from WIT locations to CVC. Id. at 54:23-25; 55:1. WIT never asked for an accounting of the used converter cores. Deposition of Kelly Hammock 73:5-23 (Sept. 19, 2020). WIT never requested a return of used cores until March of 2019, once this dispute arose between the parties. Deposition of WIT, 49:20-25; 55:1-23 (Feb. 11, 2021), Doc. 62-7, PageID 2753. WIT never requested any money from CVC for all or any portion of the cores WIT sent to CVC. Deposition of WIT 50:13-22 (Feb. 12, 2021). WIT knew CVC sold cores for salvage and never expected to receive any money from such sales. Id. at 50: 17-22; 51: 1-25; 52: 1-2.

---

1 While not a contract under Ohio law, the conversation is still evidence of an understanding of the relationship. The Ohio Statute of Frauds states that any contract that cannot be performed within one year must be in writing:

> No action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized. R.C. § 1335.05. "For over a century, the 'not to be performed within one year' provision of the Statute of Frauds, in Ohio and elsewhere, has been given literal construction. The provision applies only to agreements which, by their terms, cannot be fully performed within a year . . . ."

*Sherman v. Haines*, 73 Ohio St. 3d 125, 127, 652 N.E.2d 698 (1995).

On April 4, 2019, CVC informed WIT that the MOU obligated WIT to purchase "Minimum number of units manufactured by CVC and sold to WIT approximately equivalent to 2012 levels" through December 31, 2022. ECF 53-46, PageID 1084. On May 1, 2019, CVC sent WIT a letter demanding payment of $530,598 in past-due invoices plus an additional $1.5 million, ostensibly charging for 19 years of storing the core bank. ECF 53-8 at 140:5-12, PageID 674; ECF 53-40, PageID 993-94. 141. On May 20, 2019, WIT rejected this demand, but stated that it was willing to continue to purchase at least the approximate minimum annual amount of converters set forth in the MOU each year for the remainder of the life of the purported contract. ECF 53-41 PageID 995-99.

When CVC terminated the parties' relationship, it reassured WIT that it would return to WIT all WIT cores in its possession. The termination letter stated that "there are some cores remaining in WIT's core bank(s) and CVC is willing to work with you using any reasonable arrangement regarding these cores to finalize our business together." ECF 53-24 at WIT 00967.

On February 19, 2019, WIT President Rodney Peters asked Prugh to send him a list accounting for all of WIT's cores in CVC's possession. ECF 53-8 at 92:23-93:1 PageID 643-44; ECF 53-30 at CVC-0097 PageID 904. Prugh responded the next day that CVC was in the process of writing a computer program that would account for all of WIT's cores in CVC's possession. ECF 53- 30 at CVC-0096 PageID 903. On February 27, 2019, Prugh told Peters that he previously had sent a list of WIT's cores in CVC's possession, that they were boxing up some cores, and that he would re-send the list of WIT's cores in CVC's possession. ECF 53-30 at CVC-0095 PageID 902.

On March 1, 2019, Prugh told Peters that CVC was in the process of preparing a manual spreadsheet that would account for all of WIT's cores in CVC's possession ECF 53-30 at CVC-0095 PageID 902.

On March 3, 2019, WIT unequivocally demanded the return of all of its cores in CVC's possession. ECF 53-8 at 95:13-16 PageID 646; ECF 53-31 at WIT 00974 PageID 906. Prugh responded on March 6, 2019, that CVC was "working towards returning converter cores to you" and "we intend to do right by WIT within reasonable limits." ECF 53-31 at WIT 00973 PageID 905.

On March 12, 2019, Prugh sent Hammock an email stating that "I believe we are nearing 40 boxes ready for pickup." ECF 53-8 at 98:10-16 PageID 647; ECF 53-32 at CVC-0099 PageID 908. These were WIT cores to return to WIT. ECF 53- 8 at 98:17-99:3 PageID 647-48.

On March 20, 2019, Prugh sent WIT Vice President Kelly Hammock an email with an attached Excel spreadsheet identifying 43,645 WIT cores in its possession, 54 boxes of which were "ready for pick up." ECF 53-8 at 108:6-9 PageID 650; ECF 53-18 at p. 4 ¶¶ 18-19 PageID 878; ECF 53-33 PageID 909; ECF 53-48 PageID 1087-1168. These were WIT cores that were "on hand" and ready to be returned to WIT. ECF 53-8 at 112:17- 20 PageID 2602; ECF 53-8 at 120:2-6, 143:7-12 PageID 658, 676.   Prugh sent a follow-up email to WIT CFO Kent Houserman on March 25, 2019, stating that "[i]t's our intention to make our agreement right, currently we have 60 pallets ready to ship." ECF 53- 8 at 120:13-20 PageID 658; ECF 53-35 at WIT 00977 PageID 973.

CVC's business records reflect that it had 43,645 WIT cores on hand as of March 20, 2019. ECF 53-8 at 108:6-9 PageID 650; ECF 53-18 at p. 4 ¶¶ 18-19 PageID 878; ECF 53-33 PageID

909; ECF 53-48 PageID 1087-1168. If a customer like WIT did not have a core to rebuild, CVC would charge the customer a "core charge" in addition to the cost to remanufacture or recondition the core. ECF 53-7 at 115:1-10, 116:5-118:22; ECF 53-8 at 48:7-15; ECF 53-11 at 52:13-54:10. Multiplying CVC's core charges by the number of each unit in Exhibit 23 equals $1,095,132.50. ECF 4.

A reduction to the number of cores to be returned to WIT due to "ghost cores" must be made. A ghost core is one that shows up on the core bank but has not been turned in physically. ECF 53-8 at 125:13-16 PageID 662; ECF 53-9 at 44:23-45:2 PageID 687-88. WIT Branch Manager Tom Redden and CVC's Prugh agreed that about 20% of the listed cores were ghost cores. ECF 53-8 at 125:13-16 PageID 662; ECF 53-9 at 44:23-45:2 PageID 687-88. Reducing by 20% the $1,095,132.50 value of WIT cores identified by CVC totals $876,106.

CVC filed a complaint alleging (1) that WIT breached a contractual provision by failing to purchase an amount of units approximately equivalent to 2012 levels and failing to pay for converters received in the amount of $530,598, doc. 2, PageID 63-64, (2) failing to pay money owed, (3) asserts claims for quantum meruit and unjust enrichment for services provided),[2] as well as claims for Declaratory Relief Regarding Used Converter Cores and "Unjust Enrichment for Storage of Used Converter Cores Rent-Free."

WIT filed a counterclaim asserting: Breach of Contract by refusing to sell the minimum amount of (or any) units required; Theft by Conversion when WIT demanded return of the converter cores multiple times and Defendant refused; demands Specific Performance, seeking the

---

2  A claim for tortious interference with a contract by Eakins was dismissed, doc. 37, 39; as were tortious interference claims against WIT directors. Doc. 14.

return of any property which CVC has converted without a legal excuse; Unjust Enrichment seeking payment from CVC for its cores as well as an Order from this Court requiring disgorgement of all profits, benefits or other compensation obtained by CVC by virtue of its wrongful conduct; and a Prayer for Punitive Damages, asserting CVC acted towards WIT with ill will, malice, aggravated or egregious fraud, oppression, or insult so as to entitle WIT to recover punitive and/or exemplary damages. Doc. 6.

## II.    STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).   Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id*., at 323. The burden then

shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. Id.

Both parties seek summary judgment on claims brought under Ohio law. In reviewing an Ohio claim, the Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, the Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir.1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must

anticipate how Ohio's highest court would rule. Id. (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    LAW AND ARGUMENT

In Ohio, the essential elements of a breach of contract claim are: "(1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." *Carbone v. Nueva Constr. Grp., L.L.C.*, 2017-Ohio-382, 2017 WL 444323, at *3 (Ohio App. Feb. 2, 2017). The plaintiff bears the burden of proof on all of these issues. *Id*. But "[d]amages are not awarded for a mere breach alone." *Rasnick v. Tubbs*, 126 Ohio App.3d 431, 710 N.E.2d 750, 752 (3d Dist. 1998). Rather, the damages that can be awarded for a breach of contract are "those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of making the contract." *Eckel v. Bowling Green State Univ.*, 2012-Ohio-3164, 974 N.E.2d 754, 768 (10th Dist.). Determining what was within the contemplation of the parties requires consideration of "all the circumstances known to them when they dealt with one another." *Brown v. Spitzer Chevrolet Co.*, 181 Ohio App.3d 642, 2009-Ohio-1196, 910 N.E.2d 490, 501 (5th Dist.). Or, as the Sixth Circuit has stated, "[i]n

contract law, unlike tort law, not all proximate consequential damages are recoverable, but only those which the parties, including the breaching party, could reasonably contemplate would arise from the breach." *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 119 (6th Cir. 1976).

To prove the first element of a breach of contract claim, that a binding contract or agreement was formed, a party must establish the essential elements of a contract: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) an exchange of consideration; and (5) certainty as to the essential terms of the contract. *Juhasz v. Costanzo*, 144 Ohio App.3d 756, 762, 761 N.E.2d 679 (Ohio App. 2001). A contract is formed when there is mutual assent and consideration. *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11, 711 N.E.2d 726 (Ohio App. 1998).

CVC asserts that WIT did not order the required minimum number of units in January and February 2019. ECF 53-16 at p. 2 ¶ 3; ECF 53-25. The MOU envisions that WIT will purchase from CVC a number of converters "approximately equivalent to 2012 levels." The MOU does not require WIT to purchase any specific number of converters each month. ECF 53-8 at 135:3-6 PageID 671. Rather, the MOU requires an annual level of purchases. See ECF 53-50 at p. 7 ("The contract between the parties calls for a ten-year purchase/supply to be based on an obtained level of sales of 157,608 units.").

A party cannot determine what the annual level was until after the end of that year. CVC's General Manager Tim Prugh acknowledged that there was an understanding that there would be some seasonality. ECF 53-7 at 163:14-16. It would thus not be appropriate to terminate the agreement based on a one-month shortfall. Id. at 163:17-19.

WIT had not breached its obligation to purchase units in an amount approximately equal to 2012 levels in February 2019 – just six weeks into the year. See, e.g., *Williamson v. Digital*

*Risk, LLC*, Case No. 6:18- cv-767, 2020 WL 434954, at *3 (M.D. Fla. Jan. 28, 2020) ("Plaintiff alleges that the contract was for an annual amount of compensation; thus, it would not be possible for a breach to occur at the time of the first paycheck, which was in May of 2013."). In order to succeed, therefore, CVC's argument would require rewriting the MOU's annual requirement of "2012 levels" to provide for monthly requirements. "This rewriting of a contract is impermissible." *Fendley v. Wright State Univ.*, 2019-Ohio-1963, 136 N.E.3d 836, ¶ 17 (10th Dist.); see also *Basic Medical Care Plus, Inc. v. North Carolina Mut. Life Ins. Co.*, No. 1:03-CV-0269, 2005 WL 2205016, at *7 (M.D.N.C. Sept. 6, 2005) ("'interpolation' of the annual premium sales requirements into quarterly requirements was an unreasonable contract interpretation and was not supported by the plain language of the Marketing Agreement

Additionally, CVC waived the requirement that WIT purchase minimum annual amounts. The MOU only obligated WIT to purchase a number of converters "approximately equivalent to 2012 levels." WIT purchased 157,608 units from CVC in 2012. ECF 53-38 at CVC-0116 PageID 991. Thus, the 2012 level is 157,608 units per year. See ECF 53-50 at p. 7. CVC's owners and managers testified that "we all knew about it [the MOU]." ECF 53-4 at 61:14-17. See also ECF 53-7 at 52:10-21; ECF 53-10 at 19:5-11. WIT purchased 144,493 units in 2013, ECF 53-38 at CVC-0116, PageID 991, over eight percent below 2012 levels. Even though there is no minimum monthly requirement in the MOU, WIT's monthly purchases of units from CVC fell below 2012's average monthly levels at least 14 times in 2012, 2013, and 2014, including nine consecutive months. ECF 53-39 PageID 992. Despite this, CVC never objected that WIT was in violation of any contract that obligated it to buy a specific number of converters per year or per month. ECF 53-5 at 93:1-6 PageID 585; ECF 53-8 at 137:18-20 PageID 672. CVC never sent WIT a notice of

14

default regarding WIT's alleged failure to meet minimum purchase requirements, or a reservation of CVC's rights to seek damages for past breaches, or a demand requiring strict compliance with such requirements going forward. Nor did it terminate the contract after WIT fell below the annual minimum purchase level in 2013. This conduct constitutes a waiver of WIT's obligation to purchase the required number of converters.

"A seller waives the buyer's commitment when the seller accepts a buyer's continued failure to meet periodic minimum purchase requirements under the parties' contract." 77A C.J.S. Sales § 304 (2019). See also *English v. National Cas. Co.*, 138 Ohio St. 166, 169, 34 N.E.2d 31 (1941) ("[T]he receipt and retention of consideration after knowledge that conditions precedent have been broken, constitutes a waiver of such conditions so as to withdraw them from the terms of the contract."); 77A C.J.S. Sales § 304 ("Sellers may be equitably estopped from objecting to a buyer's breach of minimum purchase requirements in a sales contract by accepting the buyer's conduct persistently and repeatedly with no reservation or protest."). Consistent with these principles, waiver has been found to exist where, as CVC claims here, a buyer failed to comply with minimum purchase requirements. See *In re Yeager*, 227 F. Supp. 92, 94 (N.D. Ohio 1963); See also *Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App. 3d 176, 184, 475 N.E.2d 197 (8th Dist. 1984) ("Thus, subsequent acts and agreements may modify or operate as a waiver of commercial sales contract terms.").

Even if there was no waiver, CVC's failure to provide notice of default was prejudicial to WIT. "An implied waiver will arise when the claimant has been prejudicially misled or lulled into believing strict compliance is not required." *Sandler v. All Acquisition Corp.*, 954 F.2d 382, 385 (6th Cir. 1992).

15

CVC did not object when WIT first disclosed its intent to dual source torque converters. ECF 53-8 at 50:15-19 PageID 618; ECF 53-15 ¶ 22 PageID 833. It should be noted that dual sourcing, even at a 50% level, in December 2018, does not necessarily equate to purchasing at a level less than what was purchased seven years earlier in 2012. None of CVC's complaints about WIT's purchase volume in January and February 2019 mentioned the MOU. Prugh, "It never crossed my mind." ECF 53-8 at 57:10-24 PageID 624. WIT was entitled to reasonable notice of CVC's intent to terminate. CVC breached the MOU by terminating it effective immediately without notice. See *Bakies v. City of Perrysburg*, 108 Ohio St. 3d 361, 2006-Ohio-1190, 843 N.E.2d 1182, ¶ 20 ("Even where there is a contract, but the contract provides no termination date, either party to the agreement may terminate it upon reasonable notice.").

"The purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court." *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 252 (6th Cir. 2020). CVC's failure to notify WIT that its conduct allegedly breached the MOU prevented it from curing those defects by increasing its purchases to ensure that its annual converter purchases were approximately equivalent to 2012 levels. WIT's purchases in the first month and a half of 2019 were close to 2012 levels. It purchased 10,520 units in January and 5,670 in the first 14 days of February before termination on February 15. ECF 53-25. That is 16,190 cores over 45 days. To meet the 2012 annual level of 157,608 units, WIT would have had to purchase 442 units per day through the end of the year. This would not have been difficult; WIT purchased an average of 558 units per day from 2015 to 2018. See ECF 53-37 at CVC-0116. Had CVC informed WIT of the MOU or that it had to purchase 157,608 converters for the year, it could

have taken steps over the next 10 and a half months of 2019 to purchase enough converters to meet, approximately, 2012 levels. ECF 53-14 ¶ 22 PageID 741; ECF 53- 15 ¶ 23 PageID 833.

Under these circumstances, a finding that CVC did not waive WIT's obligation to make annual minimum purchases would prejudice WIT, which is contrary to the equitable principles underlying the doctrine of waiver.

CVC also alleges WIT breached the MOU by failure to pay for products it ordered and received. ECF 53-16 at pp. 2-3 ¶ 4. CVC's records confirm that it owes WIT more than WIT allegedly owes it.

Prugh testified that CVC maintained WIT's core bank separate from other customers' core banks. ECF 53-7 at 20:6-11, 21:8-13. Prugh also testified that in WIT's practice with another supplier, Dynamic, credit for scrap value is built into the price structure of the contract. ECF 53-10, PageID 703.

When CVC terminated the parties' relationship, it reassured WIT that it would return to WIT all WIT cores in its possession. The termination letter stated that "there are some cores remaining in WIT's core bank(s) and CVC is willing to work with you using any reasonable arrangement regarding these cores to finalize our business together." ECF 53-24 at WIT 00967.

CVC's business records reflect that it had 43,645 WIT cores on hand as of March 20, 2019. ECF 53-8 at 108:6-9 PageID 650; ECF 53-18 at p. 4 ¶¶ 18-19 PageID 878; ECF 53-33 PageID 909; ECF 53-48 PageID 1087-1168. If a customer like WIT did not have a core to rebuild, CVC would charge the customer a "core charge" in addition to the cost to remanufacture or recondition the core. ECF 53-7 at 115:1-10, 116:5-118:22; ECF 53-8 at 48:7-15; ECF 53-11 at 52:13-54:10.

17

Multiplying CVC's core charges by the number of each unit in Exhibit 23 equals $1,095,132.50. ECF 4.

The parties agreed that there should be a reduction of the number of cores to be returned to WIT due to what CVC calls "ghost cores." A ghost core is one that shows up on the core bank but has not been turned in physically. ECF 53-8 at 125:13-16 PageID 662; ECF 53-9 at 44:23-45:2 PageID 687-88. WIT Branch Manager Tom Redden and CVC's Prugh agreed that about 20% of the listed cores were ghost cores. ECF 53-8 at 125:13-16 PageID 662; ECF 53-9 at 44:23-45:2 PageID 687-88. Reducing by 20% the $1,095,132.50 value of WIT cores identified by CVC totals $876,106. This is what CVC owes for WIT cores. Id.

CVC asserts in its second count that it is entitled to money owed on its account with WIT. "Under Ohio law, an action on an account is appropriate where the parties have conducted a series of transactions, for which a balance remains to be paid." *Konica Minolta Bus. Sols., U.S.A., Inc. v. Allied Office Prods., Inc.*, 724 F. Supp. 2d 861, 874 (S.D. Ohio 2010) (quotations omitted). "In order to succeed in an action on an account, the plaintiff must prove both all the elements of the contract and that the contract is one that involves transactions usually the subject of a book account." Id. (quotations omitted). CVC has presented invoices to WIT totaling $530,598. ECF 1-2 at p. 5 ¶¶ 23-24, Ex. B. It is identical to CVC's claim for breach of the MOU as to unpaid invoices for past purchases. In other words, this is an alternative claim to CVC's breach of contract claim, and because it is more fitting, it is on this claim that the Court will award CVC summary judgment.

In an action for the recovery of money only, the defendant may file a counterclaim, as was done in the instant case, and there may be a finding in favor of each party; but only one judgment is proper, and that for the difference between the amounts of the findings and for the party in whose

18

favor is the greater amount. *Baldwin v. Baldwin*, 30 Ohio Law Abs. 400, 47 N.E.2d 792 (1940). WIT owes CVC $530,598 for converter cores. ECF 53-8 at 139:10-17 PageID 673; ECF 53-17 at pp. 2-3 ¶¶ 3-4 PageID 868-69. Since CVC owes WIT more than WIT allegedly owes CVC, WIT is entitled to a set-off.

"Under Ohio law, a setoff is that right which exists between two parties, each of whom under an independent contract owes a definite amount to the other, to set off their respective debts by way of mutual deduction*." In re Roberds, Inc.*, 285 B.R. 651, 658 (Bankr. S.D. Ohio 2002). See also *Covington v. University Hosp.*, 149 Ohio App. 3d 479, 2002-Ohio-4761, 778 N.E.2d 54, ¶ 15 (10th Dist.) ("The rule allows parties that owe mutual debts to state the accounts between them, subtract one from the other, and pay only the balance."); *In re U.S. Aeroteam, Inc*., 327 B.R. 852, 861 (Bankr. S.D. Ohio 2005) ("Setoff is a doctrine that allows entities who owe money to each other to cancel out or apply their mutual debts against each other thereby avoiding the 'absurdity of making A pay B when B owes A.'")

WIT asserted three counterclaims seeking recovery of its converter cores. See ECF 6 ¶¶ 62-81. "[S]etoff involves mutual debts and claims arising from different transactions, while recoupment is specifically limited to claims and demands arising from the same transaction." *In re Reeves*, 265 B.R. 766, 770 n. 1 (Bankr. N.D. Ohio 2001). See also *Riley v. Montgomery*, 11 Ohio St. 3d 75, 77, 463 N.E.2d 1246 (1984) ("Recoupment is a defense which arises out of the same transaction as plaintiff's claim, is a claim of right to reduce the amount demanded and can be had only to an extent sufficient to satisfy the plaintiff's claim.").

"Recoupment is defined as the setting up of a demand arising from the same transaction as the plaintiff's claim, to abate or reduce the claim." *Reeves*, 265 B.R. at 769. "Thus, in its simplest

terms, recoupment allows a defendant to reduce the amount of a plaintiff's claim to the extent that the defendant has a valid defense against the plaintiff which arose out of the same transaction as the plaintiff's claim." Id. at 769-70.

Courts routinely grant summary judgment where the amount the plaintiff owes the defendant via setoff is greater than the defendant's alleged debt to the plaintiff. See, e.g., *In re Roberds, Inc*., 285 B.R. 651, 653 (Bankr. S.D. Ohio 2002); *PHD, Inc. v. Coast Bus. Credit*, 147 F. Supp. 2d 809, 811-12 (N.D. Ohio 2001); *U.S. Aeroteam*, 327 B.R. at 863. ("Delphi may use USAT's prepetition debt for the rotors to establish dual or mutual obligations between the parties forming the basis for a valid right of setoff."). Both the Ohio and federal Civil Rules use the term 'counterclaim' in the broad sense to include setoffs and recoupments." *Laventhol & Horwath v. Lawrence J. Rich Co*., 62 Ohio Misc. 2d 718, 721, 610 N.E.2d 1214 (M.C. 1991). "If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." Fed. R. Civ. P. 8(c)(2).

CVC's business records reflect that it had 43,645 WIT cores on hand as of March 20, 2019. ECF 53-8 at 108:6-9 PageID 650; ECF 53-18 at p. 4 ¶¶ 18-19 PageID 878; ECF 53-33 PageID 909; ECF 53-48 PageID 1087-1168. If a customer like WIT did not have a core to rebuild, CVC would charge the customer a "core charge" in addition to the cost to remanufacture or recondition the core. ECF 53-7 at 115:1-10, 116:5-118:22; ECF 53-8 at 48:7-15; ECF 53-11 at 52:13-54:10. Multiplying CVC's core charges by the number of each unit in Exhibit 23 equals $1,095,132.50. ECF 4.

Since 20% of the cores on the books were "ghost cores," ECF 53-8 at 125:13-16 PageID 662; ECF 53-9 at 44:23-45:2 PageID 687-88, reducing by 20% the $1,095,132.50 value of WIT cores identified by CVC totals $876,106. CVC has converted these cores and WIT may recoup an equal amount. WIT has thus established that CVC's debt to it is greater than its alleged debt to CVC arising out of the same transactions and will be awarded summary judgment on it conversion recoupment claim. Accord *Precision of New Hampton, Inc. v. Transtar Indus., Inc.*, No. C14-2067, 2015 WL 12911989, at *5 (N.D. Iowa Nov. 30, 2015) (it would be unjust for Precision to receive converter cores to which it was not otherwise entitled and, without notifying Transtar, benefit from the value of those cores without compensating Transtar).

CVC also asserts a claim for *quantum meruit*. The basis of CVC's cause of action for *quantum meruit* is that "WIT has failed to pay for the products it ordered and received." ECF 53-16 at p. 3 ¶ 7. This is part of CVC's breach of contract claim. The MOU prevents CVC from asserting a *quantum meruit* claim based on the unpaid invoices. "It is well established that a quasi-contract claim, and thus the remedy of *quantum meruit*, is unavailable when the subject of the dispute is governed by an express contract." *John D. Smith Co. v. Lipsky*, 2d Dist. Montgomery No. 2019- CA-65, 2020-Ohio-3985, ¶ 54. Even if this were not true, WIT has a right of setoff/recoupment in the amount of the $876,106, which is greater than the debt claimed by CVC. WIT is therefore entitled to summary judgment on CVC's *quantum meruit* claim.

CVC also asserts a claim for unjust enrichment. CVC claims WIT failed to pay CVC rent or a storage fee for its cores. CVC reasons "WIT has never paid a storage fee for the used converter cores and has never requested that the used converter cores be reconditioned." ECF 1-2 ¶ 47. CVC's reliance on the MOU precludes this claim: "the remedy of unjust enrichment is not

21

available where there is an express contract covering the same subject." *LeVangie v. Raleigh*, 2d Dist. Montgomery No. 27946, 2019-Ohio-810, ¶ 16. The MOU recited that "WIT is the major customer and distributor of converters remanufactured by CVC," and the parties agreed that CVC would "remanufacture[ ] converters to be acquired by WIT." ECF 53-45 at p. 2. Prugh testified that CVC reconditioned WIT's used converter cores at WIT's request for years and that this arrangement included CVC's storage of WIT's cores. PUF ¶ 22. CVC's storage of WIT cores therefore was part of the same subject matter as the MOU. As a result, it cannot provide the basis for an unjust enrichment claim, and summary judgment is appropriate.

Even if an express contract did not preclude an unjust enrichment claim as a matter of law, CVC cannot establish all of the essential elements of this claim. They are "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Lone Star Equities, Inc. v. Dimitrouleas*, 2d Dist. No. 26321, 2015-Ohio2294, 34 N.E.3d 936, ¶ 70. Because CVC never demanded any kind of rent or storage fee from WIT to store WIT cores on its premises, there is no injustice. ECF 53-5 at 99:17-20 PageID 586; ECF 53-8 at 142:16-143:6 PageID 675-76; ECF 53-11 at 38:16-24 PageID 718; ECF 53-18 at p. 1 ¶ 2 PageID 875. This is fatal to this claim. See *Hern v. Mier-Baur Oldsmobile GMC Truck, Inc*., 8th Dist. Cuyahoga No. 76660, 2000 WL 1176875, at *4 (Aug. 17, 2000) (plaintiff could not recover rent for the time period that it purposely made no demand for rent); Thus, CVC cannot recover for rent that it never demanded of WIT.[3]

---

[3] Because the Court is granting WIT summary judgment on CVC's claim of unjust enrichment, it need not consider WIT's asserted defense of unclean hands.

CVC also seeks a declaration that it owns the cores in its possession. CVC claims WIT abandoned its converter cores and that, as a result, it may sell them for salvage. ECF 1-2 at p. 8 ¶ 49. To obtain a declaratory judgment, CVC "must demonstrate that the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *B&N Coal, Inc. v. Blue Racer Midstream, LLC*, 414 F. Supp. 3d 1049, 1053 (S.D. Ohio 2019) (quotations omitted). All of the evidence confirms that WIT owns the cores in its core bank for less than a year on February 15, 2019.

WIT requested that CVC return the WIT core bank just days after CVC terminated their relationship. ECF 53-28. The fact that WIT never refused to pay a rent or storage fee to store WIT cores on its premises, because CVC never made one, adds weight to this conclusion. *Eichenlaub v. Neil*, 6 Ohio C.D. 567, 570 (1895) (a demand of rent was essential for a forfeiture); see also 49 Am. Jur. 2d Landlord & Tenant § 247 (2018) ("It is the general common-law rule that unless a demand for rent is expressly waived by the terms of a lease[,] a demand by the lessor is absolutely essential to work a forfeiture thereof for nonpayment of rent, on the day due, and for the precise amount due.") (footnotes omitted); 52 C.J.S. Landlord & Tenant § 191 (2012) ("Under the common law, a demand ordinarily is essential before the landlord can enforce a forfeiture because of a failure to pay rent."). For this reason, CVC's motion for declaratory judgment will be denied.

As for WIT's request for punitive damages, in Ohio, where the breach of contract action is accompanied by a connected tort that is fraudulent, wanton, reckless, malicious, or oppressive, punitive damages may be appropriate. *Mabry–Wright v. Zlotnik*, 165 Ohio App.3d 1, 2005 Ohio 5619, 844 N.E.2d 858, ¶ 18 (3d Dist.); see also *Hofner v. Davis*, 111 Ohio App.3d 255, 259, 675

23

N.E.2d 1339 (6th Dist. 1996), and *Burns v. Prudential Sec., Inc.*, 167 Ohio App. 3d 809, 2006 Ohio 3550, 857 N.E.2d 621 (3rd Dist.). In this case, WIT has not adduced evidence that CVC's actions were fraudulent, wanton, reckless, malicious, or oppressive. Thus, summary judgment will be granted to CVC on WIT's claims for punitive damages.

## IV.    Conclusion

The Court hereby **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, doc. 50, and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment. Docs. 53, 73. Because CVC manufactured and sold to WIT torque converters for which it billed $530,598 for which WIT has not paid, Plaintiff is awarded summary judgment on its claim for failure to pay money owed; because CVC had $876,106 in converter cores WIT's core bank when it ceased the contract, summary judgment is awarded on WIT's recoupment counterclaim. Because the two offset, the **CLERK** is **ORDERED** to enter judgement awarding Defendants/Counterclaimants Whatever It Takes, Inc. $345,508. Because the remedy of *quantum meruit*, is unavailable when the subject of the dispute is governed by an express contract, summary judgment is **GRANTED** to CVC on WIT's *quantum meruit* claim. Because CVC's storage of WIT cores was part of the same subject matter as the MOU, the storage cannot provide the basis for an unjust enrichment claim, summary judgment is **GRANTED** to WIT on CVC'S unjust enrichment claim. Because CVC never demanded rent and WIT never refused to pay rent, CVC's summary judgment motion for declaratory judgment is **DENIED**. Because WIT has not adduced evidence that CVC's actions were fraudulent, wanton, reckless, malicious, or oppressive, summary judgment is **GRANTED** to CVC on WIT's claims for punitive damages. All issues being resolved, the instant case is **TERMINATED** from the docket of the

24

United States District Court for the Southern District of Ohio, Western Division at Dayton.

      **DONE** and **ORDERED** this Tuesday, April 5, 2022.


                                               s/Thomas M. Rose

                                           THOMAS M. ROSE
                                UNITED STATES DISTRICT JUDGE